**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ROXANNE MAYS,

      *Plaintiff*,

    v.

EDUARDO TOLOZA, ROBERT
KAKOLESKI, MUHAMMED AKIL, CITY OF
JERSEY CITY, and JOHN DOES 1-25,

      *Defendants*.

Civil Action No. 13-6108
(JMV) (JBC)

**OPINION**

**John Michael Vazquez, U.S.D.J.**

      This case concerns allegations that while Plaintiff was employed with the City of Jersey City, she was harassed and discriminated against based on her race and national origin, and then retaliated against, in violation of state and federal laws. Presently before the Court is Defendants' motion for summary judgment. The Court reviewed all submissions[1] made in support and opposition of the motions and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, Defendants' motion is **GRANTED**.

---

[1] Defendants' brief in support of their motion for summary judgment will be referred to as "Mov. Br.," D.E. 172-1. Plaintiff's opposition brief will be referred to as "Opp. Br.," D.E. 180. Defendants' reply brief will be referred to as "Reply," D.E. 184.

## I.    FACTUAL BACKGROUND[2] AND PROCEDURAL HISTORY

### A.  The Parties

Plaintiff Roxanne Mays was an employee of the City of Jersey City ("Jersey City" or the "City").  DSOMF ¶¶ 18-43.  She is of African American and Puerto Rican ancestry.  DSOMF ¶

---

[2] The factual background is taken from Defendants' Statement of Material Facts Not in Dispute ("DSOMF"), D.E. 154-1; Plaintiff's Response to Defendants' Statement of Material Facts Not in Dispute and Supplemental Statement of Disputed Material Facts ("PSOMF"), D.E. 168; and the exhibits attached to Defendants' motion for summary judgment, D.E. 172, and Plaintiff's opposition, D.E. 181.

PSOMF suffers from numerous deficiencies.  First, it does not contain separately numbered paragraphs of supplemental statements of material facts in dispute.  Local Civil Rule 56.1 requires an opponent of a motion for summary judgment to provide a responsive statement of material facts.

Second, in responding to Defendants' statement of material facts, Plaintiff included approximately 50 citations to her deposition transcript in the first paragraph, and then in subsequent paragraphs, referenced the "response to number 1 above."  *See, e.g.*, PSOMF ¶¶ 2-9.  The pages cited appear to cover an array of topics discussed in Plaintiff's deposition and it is not clear to the Court which provisions of the deposition testimony are intended to support specific paragraphs of PSOMF.  "District Courts are not required to search through the record for evidence to support a party's assertion of the existence of a genuine dispute of material fact."  *Goldsack v. Walmart Stores, Inc.*, 800 F. App'x 95, 99 n.4 (3d Cir. 2020).  The Court has done its best to follow Plaintiff's factual disputes, but to the extent the Court is unable to discern what in the record causes Plaintiff to dispute a specific fact, that fact will be deemed undisputed.  *See Nike, Inc. v. E. Ports Custom Brokers, Inc.*, No. 11-4390, 2018 WL 3472628, at *1 n.1 (D.N.J. July 19, 2018) (where non-moving party did not provide citations to specific facts of record in its responsive statement, Court deemed all statements not properly denied by non-moving party as admitted); *Friedman v. Bank of Am., N.A.*, No. 09-2214, 2012 WL 1019220, at *6 n.2 (D.N.J. Mar. 26, 2012) ("[T]he court will consider any statement of fact which was not denied by the Plaintiffs with a citation to the record as undisputed for the purposes of this motion for summary judgment.").

Third, Plaintiff denies numerous paragraphs of Defendants' statement without citing to any evidence in the record.  If an opponent denies any paragraphs in his responsive statement, she must "cit[e] to the affidavits and other documents submitted in connection with the motion."  L. Civ. R. 56.1(a).  A court may deem paragraphs that do not comply with requirements set forth in Local Civil Rule 56.1 as admitted.  *See, e.g.*, *7-Eleven, Inc. v. Sodhi*, No. 13-3715, 2016 WL 3085897, at *2 n.5 (D.N.J. May 31, 2016) (concluding that paragraphs in which defendants "disagreed" without providing support to the record were deemed undisputed).  Accordingly, the Court will deem each paragraph that Plaintiff denied without providing proper support as admitted.

45.  Plaintiff began working for the City in 1995 and, as of the time she filed her Complaint, was still an employee.  *Id.* ¶¶ 18, 42-43.

Defendant Jersey City is a municipality in New Jersey.  Complaint ("Compl.") ¶ 2[3]; Answer ("Ans.") ¶ 2.  Defendant Eduardo Toloza was the Tax Assessor of the City and as a department head, was a policy making official.  *Id.* ¶ 3.  Toloza was also Plaintiff's direct supervisor.  *Id.*  Defendant Kakoleski was appointed the City's Business Administrator in March of 2014.  D.E. 173-5 at 9:6-13.  Prior to his appointment, he served as an Assistant Business Administrator beginning in 2004, and the Acting Business Administrator beginning on August 1, 2013.  *Id.* 9:14-21, 10:1-12.  As Business Administrator, Kakoleski heads the Department of Administration. *Id.* 9:22-25.  Defendant Akil initially worked for the City as an Assistant Business Administrator in October 2001, resigning in July 2002.  DSOMF ¶¶ 154-55.  Akil returned to work for the City in June 2004 as an Aide to the Mayor, became a Systems Analyst in the Department of Health and Human services in November 2004, and became the Chief of Staff to the Mayor on July 1, 2013.  *Id.* ¶¶ 166, 168.

    **B.  Relevant Background**

Summarized below are several events that are most relevant to Plaintiff's claims. Additional facts and background are provided in the Analysis Section.

    **1.  Plaintiff's Residency and the New Jersey First Act**

Plaintiff was a resident of Jersey City when she commenced employment with the City. DSOMF ¶ 50.  Plaintiff later moved to Pennsylvania, although the parties dispute precisely when this occurred.  Defendants posit that on March 3, 2011, Plaintiff submitted an address change,

---

[3] The Court cites to the Complaint where a fact does not appear to be in dispute but is not otherwise found in the record.

which indicated that she moved from Tannersville, Pennsylvania to East Stroudsburg, Pennsylvania. *Id.* ¶ 53. Plaintiff purports to "disagree" with this fact, however, she provides no proper citation to the record in support. PSOMF ¶ 53. However, Plaintiff testified during her deposition that she moved from Jersey City to Tannersville in July 2011, and then moved to East Stroudsburg in March 2012. DSOMF ¶ 54. On or about August 11, 2011, Plaintiff sent a letter to the City's Department of Personnel requesting that her address be changed from one in Jersey City to one in Tannersville. *Id.* ¶ 55.

On September 1, 2011, the New Jersey First Act, N.J. Stat. Ann. § 52:14-7, *et seq.* became effective. *Id.* ¶ 56. Pursuant to this law, municipal government employees are required to have their principal residence in New Jersey; however, the law contained a "grandfather" provision by which municipal employees already living out-of-state could continue to do so. *Id.* ¶ 58.

Although Plaintiff appeared to fall within the grandfather exception since she notified the City of her change in residence in March and/or August of 2011, she filed an application for an exemption with the State's Employee Residency Review Committee in December 2011. *Id.* ¶ 59. Toloza submitted a letter in support of Plaintiff's application for the exemption. *Id.* ¶ 61. Plaintiff was informed by the Committee on December 30, 2011 that she met the grandfather provision of the law and, therefore, did not require an exemption. *Id.* ¶ 62.

In May 2013, Defendants initiated an investigation into Plaintiff's compliance with the New Jersey First Act. *Id.* ¶ 134. The parties dispute the impetus for the investigation. According to the Defendants, there were discrepancies in Plaintiff's personnel file and the City's Business Administrator sought to verify that Plaintiff was in compliance with the law. *Id.* ¶ 135. According to Plaintiff, the investigation was started as an attempt to terminate her employment. *Id.* ¶ 134.

Defendants Toloza, Kakoleski, and Akil had no involvement in the investigation. *Id.* ¶ 136.[4]  As part of the investigation, Plaintiff was required to provide a timeline of her residences and documents to verify her residence prior to the effective date of the law. *Id.* ¶¶ 137-40.  At the end of the investigation, neither Plaintiff nor her husband – who also worked for the City – were terminated. *Id.* ¶ 142.

### 2.  Plaintiff's Previous Complaints

On April 24, 2012, Plaintiff filed a complaint (the "Internal Complaint") with the City's Office of Equal Opportunity/Affirmative Action ("OEO") against Toloza; the complaint was supplemented on or about July 11, 2012 with complaints against Michelle Hennessey.[5]  *Id.* ¶ 67. The Internal Complaint claimed a hostile work environment based on the following:

> (i) Plaintiff has "been pushed back further" since Ms. Kakoleski[6] joined the office; (ii) Plaintiff has had to use more sick time since joining the office; (iii) ███████████████████████████████████████████ ███████████████████████████████████████; (iv) Plaintiff's health "is suffering and deteriorating due to the outright favoritism and discrimination within the office of the Tax Assessor;" (v) Plaintiff is under "pressure from other minorities in the office not to take time off because the office becomes 'aggressive' when [Plaintiff] is absent;" (vi) other employees often try to schedule their time off with Plaintiff; (vii) Toloza "has never placed either Michelle Hennessey or Christine Kakoleski in the positions he's [sic] place me;" (viii) Ms. Hennessey withheld information from Plaintiff relating to tax court cases; and (ix) Toloza assigns Plaintiff more work and Ms. Hennessey threatens her when Plaintiff questions Ms. Hennessey about tax court.

*Id.* ¶ 68.

---

[4] Plaintiff indicates that she disputes this fact, however, she provides no citation to disputed facts in the record.

[5] Michelle Hennessey was, at relevant times, a Deputy Tax Assessor for the City.  DSOMF ¶ 37.

[6] Christine Kakoleski was, at the time the Complaint was filed, a provisional Office Manager of the Office of the Tax Assessor.  Compl. ¶ 13.  She is the wife of Defendant Robert Kakoleski.  *Id.* ¶ 5.

The City's Equal Opportunity Officer sent Plaintiff a memo on April 26, 2012, confirming receipt of the Internal Complaint, and informing Plaintiff that the City would conduct an internal investigation, that she had 300 days to file a complaint with the Equal Employment Opportunity Commission ("EEOC"), and that she had 180 days to file a complaint with the Division of Civil Rights ("DCR"). *Id.* ¶ 69. The Equal Opportunity Officer also sent Toloza notification of the complaint. *Id.* ¶ 70. As part of its investigation, the City interviewed Plaintiff, Christine Kakoleski, and Hennessey. *Id.* ¶¶ 71-74. The OEO ultimately determined that the Internal Complaint had no merit. *Id.* ¶ 75. After filing the Internal Complaint, Plaintiff indicates that Toloza treated her differently and "[i]t just became colder and colder." *Id.* ¶ 87.

On or about August 1, 2012, Plaintiff filed a Charge of Discrimination with the EEOC and DCR for racial discrimination in violation of Title VII of the Civil Rights Act of 1964 (the "External Complaint"). *Id.* ¶ 76. The External Complaint alleged that Toloza "(i) 'berated' Plaintiff's workload to individuals in the office; (ii) []allowed two other managers a fluctuating time schedule, but not Plaintiff; (iii) ostracized Plaintiff in front of others; (iv) verbally abused Plaintiff for missing late meetings; and (v) failed all (sic) communications with Plaintiff." *Id.* ¶ 76. On or about April 24, 2013, the EEOC issued a determination on the merits, stating that it was "unable to conclude that the information obtained establishes a violation with respect to [Plaintiff's] allegation that she was discriminated against." *Id.* ¶ 80 (alteration in original).

### 3. Jersey City's Tax Revaluation Project

In early 2010, Jersey City initiated a tax revaluation of real property values within the City. *Id.* ¶ 103. The City established a committee to oversee the revaluation process (the "Committee"), and Toloza recommended Plaintiff be placed on the Committee. *Id.* ¶¶ 105-106. Ultimately, Plaintiff was approved as a Committee member, along with Hennessey; John Mercer, the Assistant

Business Administrator; Jeffrey Weigner, a senior planner from the Division of Planning; Maryann Murphy from the Law Department; and Donna Mauer, Chief Financial Officer. *Id.* ¶ 107.

The Committee issued a Request for Proposals, inviting firms to submit proposals for the revaluation project, and then evaluated the proposals received. *Id.* ¶¶ 108-113. Realty Appraisal Company submitted a proposal, in which it identified the names of its staff that would work on the project. *Id.* ¶ 114. One staff member was former City employee Brian O'Reilly. *Id.* ¶¶ 24, 115, 117. The proposal noted that O'Reilly had "6 years of experience as Business Administrator for Jersey City," thus Committee members who viewed the proposal were aware of O'Reilly's former and current employment. *Id.* ¶¶ 115-16. In addition, the City's Corporation Counsel was aware of O'Reilly's former and current employment and determined that no conflict existed. *Id.* ¶ 118. The Committee discussed the issue of a possible conflict of interest before voting on the proposals received, noting that the Corporation Counsel did not believe that there was a conflict. *Id.* ¶ 119.

Plaintiff indicates that she was uncomfortable with the City awarding the contract to Realty Appraisal in light of the possible conflict of interest. *Id.* ¶ 121. After the Committee's discussion of the Corporation Counsel's opinion as to the lack of a conflict, Plaintiff went to Toloza's office to review the opinion letter. *Id.* ¶ 120. Additionally, Plaintiff raised the issue with Murphy in the presence of Toloza and Hennessey before the contract was awarded in February 2011. *Id.* ¶ 121. The Committee ultimately relied on Corporation Counsel's assurance and awarded the contract to Realty Appraisal. *Id.* ¶ 122.

After the contract was awarded, Plaintiff contacted the City's ethical committee "shortly after a training seminar in February 2011" and noted her concern over the conflict; she was informed that it was too late to do anything about the contract. *Id.* ¶ 123. In 2013, the contract

with Realty Appraisal was suspended based on concerns about a conflict of interest raised by the mayor.  *Id.* ¶¶ 126-130.

### 4.  Defendant Akil's Alleged Misconduct

In 2002, Akil was working as an Assistant Business Administrator.  *Id.* ¶ 154.  In June of that year, Plaintiff submits that Akil directed a subordinate to do work for Akil's outside business off-site and during business hours.  *Id.* ¶ 161.  Plaintiff submitted a memorandum to the City's Personnel Director and Business Administrator, Carlton McGee, reporting Akil's improprieties. *Id.* ¶¶ 25, 160.  Plaintiff never spoke with Akil about the memo, however, she believes that McGee, who was Akil's roommate at the time, may have informed Akil about the memo.  *Id.* ¶¶ 162-63.

Akil ceased working for the City on July 12, 2002, and the parties dispute whether he resigned or was fired.  *Id.* ¶ 155.  Defendants submit that Akil voluntarily resigned to relocate and work for his family's business.  *Id.* ¶ 164.  Plaintiff provides deposition testimony from Nancy Ramos – who, at the time served as the head of the City's Department of Human Resources – explaining that Akil's file indicated that he was "terminated."  PSOMF ¶ 164.  Akil was not aware of Plaintiff's allegations, her report, or that she might have been involved in his termination/resignation.  *Id.* ¶ 165.

In 2004, Akil began to work for the City again, however, Plaintiff was unaware of his return until July 1, 2013 when Akil was appointed as Chief of Staff to the Mayor.  DSOMF ¶¶ 166-68. Plaintiff was told by two City employees that once Akil was named Chief of Staff, he said he would target the people who hurt him, including her.  *Id.* ¶ 169.  Defendants indicate that (1) Akil never told any City employees that he was targeting Plaintiff, and (2) Plaintiff failed to confirm

whether Akil actually said this to the two unnamed employees or if it was simply the opinion of those employees as to what Akil might do.  *Id.* ¶ 170.[7]

### 5.  Alleged Instances of Discrimination

Plaintiff believes that her mistreatment in the workplace began in approximately 2010. DSOMF ¶ 86.[8]  Plaintiff testified that she believes Defendant Akil is discriminating against her based on "maybe origin, but not color."  *Id.* ¶ 87.  When asked whether he was discriminating against her based on her Spanish and Puerto Rican heritage, Plaintiff stated "I – believe he might not – I'm not sure with Muhammed [Akil]."  *Id.* (alteration in original).  Plaintiff further explained that she believed Toloza mistreated her on the basis of her race.  *Id.*  When asked what conduct specifically made Plaintiff believe she was being mistreated based on her race, she mentioned the following: she did not receiv the support she needed to work on tax appeals; her computer was "misused when it was supposed to go to the county"; she was asked to order her own supplies; she was alienated; she was not called into important meetings.  *Id.*  Plaintiff testified that Toloza alienated her and assigned her something out of the office "whenever there was something important" in the office.  *Id.*  Toloza never made any comments about Plaintiff's national origin, race, or color.  *Id.* ¶ 88.  In 2012 or 2013, Plaintiff believes that Toloza discriminated against her by not assigning her the more highly regarded tax appeals.  *Id.* ¶ 89.  Toloza testified that he failed to assign Plaintiff these appeals because he believed that she needed additional training.  *Id.* ¶ 90.

Another area of alleged discrimination concerns Plaintiff's allegations that in the wake of Hurricane Sandy, she was denied compensatory time to assist in clean-up efforts at City Hall,

---

[7] Although Plaintiff indicates that she "disagrees" with these facts, she has failed to cite to any disputed fact in the record.

[8] Plaintiff indicates that she "disagrees" with this statement of fact but cites to the "Affidavit of R. Mays" which is not included in the summary judgment record.

which was offered to her Caucasian coworkers. *Id.* ¶ 91.  The parties dispute the reason why Plaintiff was denied compensatory time – Defendant state that it was because (1) Plaintiff resided out-of-state at the time; and (2) Toloza could not offer compensatory time to employees in his department without approval of the administration.  *Id.*  Plaintiff submits that Toloza did in fact offer compensatory time to other managers in his department.  PSOMF ¶ 91.

Plaintiff further cites Toloza's failure to accommodate her request to change her workday hours as another example of discrimination.  DSOMF ¶ 92.  Managers were required to work 40 hours per week.  *Id.* ¶ 99.  Hennessey and Christine Kakoleski preferred to begin their workdays at 9:30 a.m., while Plaintiff wished to start her day before 8:30 a.m.  *Id.* ¶ 94.  For a period of time in 2012, Toloza allowed Plaintiff to commence her workday between 7:30 and 7:50 a.m. and permitted Hennessey to start between 9:30 and 10:00 a.m.  *Id.* ¶ 95.  At some point, other employees in the department began to complain about people starting their days too early or too late and, as a result, Toloza sought to establish a unified working schedule.  *Id.* ¶ 96.  On November 21, 2013, Toloza issued a schedule that required all managers within the department to start their day between 8:30 and 9:30 a.m., effective December 2, 2013.  *Id.* ¶ 97.  Toloza explained that the 8:30 to 9:30 a.m. window was appropriate because Deputy Assessors often met with attorneys, appraisers, and property owners later in the day; he continued City Hall was not open at 7:30 a.m. so there was no business being handled at that hour that fulfilled the office's tasks.  *Id.* ¶ 98.

### C.  Procedural History

Plaintiff filed a Complaint in the Superior Court of New Jersey, Law Division, Hudson County on September 13, 2013.  D.E. 1-1.  The Complaint includes seven counts and alleges that Defendants discriminated against Plaintiff in violation of 42 U.S.C. § 1983, the New Jersey Law Against Discrimination ("NJLAD"), the New Jersey Conscientious Employee Protection Act

("CEPA"), and further alleges that Defendants breached the parties' employment contract, breached the covenant of good faith and fair dealing, and charges Defendants with "a general violation" of New Jersey's civil service laws. Defendants removed the action to this Court. D.E. 1. Defendants later sought leave to file a motion for summary judgment, D.E. 154, which this Court granted, D.E. 171.

## II.    SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits,

or by the depositions, answers to interrogatories, and admissions on file, designate specific facts

showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To

withstand a properly supported motion for summary judgment, the nonmoving party must identify

specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at

250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the

court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d

523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a

showing sufficient to establish the existence of an element essential to that party's case." *Celotex*,

477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however,

summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## III.    ANALYSIS

Defendants seek summary judgment on as to all Plaintiff's claims. While the Complaint

purports to raise seven separate counts, there appears to be overlap between some of the claims.

The Court is not clear as to what claim is raised in Count One. The following are referenced

among Count One's allegations: racially based violations of the CEPA, Compl. ¶ 25; racially based

retaliation under the CEPA, *id.* ¶ 26; a "constitutional tort caused by a government entity under

color of law which is within the scope of and remediable under 42 U.S.C. §1983," *id.* ¶ 29; illegal

discrimination in violation of the NJLAD, *id.* ¶ 30; "breach of the City of Jersey City's contract of

employment with the plaintiff," *id.* ¶ 31; "breach of the City of Jersey City's obligation to deal and

proceed in good faith and deal fairly with the plaintiff," *id.*; and "breach of Civil Service laws and

title 10 of New Jersey Statutes," *id.* ¶ 32. Count Two alleges discrimination in violation of the

NJLAD. *Id.* ¶ 24. Count Three alleges discrimination and retaliation in violation of 42 U.S.C.

§1983.  *Id.* ¶ 36.  Count Four alleges discrimination in violation of the CEPA.  *Id.* ¶ 38.  Count

Five[9] alleges retaliation in violation of the CEPA.  *Id.* ¶ 40.  Count Six alleges a breach of

Plaintiff's employment contract with the City as well as a breach of the covenant of good faith and

fair dealing.  *Id.* ¶ 42.  Count Seven alleges a breach of Plaintiff's employment contract with the

City, a breach of the covenant of good faith and fair dealing, and a general violation of the Civil

Service Law of the State of New Jersey.  *Id.* ¶ 44.  Because of the overlap among the Counts, the

Court will address Plaintiff's claims by governing law rather than by individual counts.

### A.  CEPA Claims

Counts Four and Five and a component of Count One are brought under the CEPA.  Two

events detailed above appear to form the basis of Plaintiff's CEPA claims: (1) Plaintiff's reports

about a potential conflict of interest in the City's tax revaluation process; and (2) Plaintiff's

reporting of Defendant Akil's use of government employees to perform non-government work.

CEPA, N.J. Stat. Ann. § 34:19-1, *et seq.*, permits a whistleblowing employee to bring suit

against an employer that retaliated against her through an adverse employment action.  *Winters v.*

*N. Hudson Reg'l Fire & Rescue*, 50 A.3d 649, 662 (N.J. 2012).  Courts use the burden-shifting

framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to analyze CEPA

claims.  *Id.*  Thus, the employee carries the initial burden of establishing a *prima facie* case of

retaliation.    The burden then shifts to the employer to "articulate some legitimate,

nondiscriminatory reason for the adverse employment action."  *Id.* (quoting *McDonnell Douglas*

*Corp.*, 411 U.S. at 802).  Next, the employee must establish that "the employer's reason was false

---

[9] Plaintiff labels two claims in the Complaint as "Count Four."  The Court will refer to the second Count Four as Count Five, the Complaint's Count Five as Count Six, and the Complaint's Count Six as Count Seven.  *See* Compl. ¶¶ 39-44.

and that retaliation was the real reason." *Id.* (quoting *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 92 (3d Cir. 1999)) (internal quotation marks and brackets omitted).

To establish a *prima facie* CEPA claim, a plaintiff must show the following:

> (1) . . . she reasonably believed that . . . her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) . . . she performed a 'whistle-blowing' activity described in [N.J. Stat. Ann. §] 34:19-3(c); (3) an adverse employment action was taken against . . . her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Lippman v. Ethicon, Inc.*, 119 A.3d 215, 226 (N.J. 2015).

Defendants argue that they are entitled to summary judgment on Plaintiff's CEPA claims for three reasons. First, with respect to the conflict-of-interest issue, Plaintiff did not engage in any act of whistleblowing. Mov. Br. at 8. Second, Plaintiff was not the subject of an adverse employment action. *Id.* at 10. Third, because Plaintiff was not the subject of an adverse employment action, she cannot establish a causal connection between the alleged whistleblowing activity and the alleged retaliatory acts. *Id.* at 15.

As to the first point, Defendants argue that City officials were aware of the alleged conflict of interest and, therefore, Plaintiff did not perform a whistleblowing activity when she alerted them of the issue. *Id.* at 8. CEPA provides in relevant part that

> An employer shall not take any retaliatory action against an employee because the employee . . . [d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or (2) is fraudulent or criminal. . . .

N.J. Stat. Ann. § 34:19-3(a). New Jersey courts have found that if the supervisors or public body were already aware of an issue that formed the basis of a CEPA claim, a plaintiff has not disclosed

14

anything and is not considered protected under CEPA. *Watkins v. State of N.J., Office of the Attorney Gen.*, No. 3387-99, 2005 WL 3711182, at \*3 (N.J. Super. Ct. App. Div. Jan. 30, 2006).

Defendants submit that "it is not disputed that the Plaintiff's supervisor and other City officials were 'well aware' of the alleged conflict of interest." Mov. Br. at 8. The parties agree that Plaintiff was on the Committee to guide the City's revaluation process; that Realty Appraisal Company was one of the firms that submitted a proposal; that in its proposal, Reality Appraisal Company identified the firm's staff that would work on the project; and that among the list of staff members was Brian O'Reilly, who the proposal noted had "6 years of experience as Business Administrator for Jersey City." DSOMF ¶¶ 107, 111, 114, 115. Defendants further submit that anyone on the Committee who reviewed the proposal would have been aware of Mr. O'Reilly's current employment with Realty Appraisal and prior employment as the City's Business Administrator. DSOMF ¶ 116. Plaintiff "disagrees" with this fact – she indicates that she "was advised of the conflict before she received and reviewed the Realty Appraisal packet." PSOMF ¶ 116. Nevertheless, Plaintiff does not dispute that the other individuals on the Committee would have been aware of O'Reilly's current and former employment by way of the proposal reviewing process. It is undisputed that the Committee members included Plaintiff and five others. DSOMF ¶ 107; PSOMF ¶ 7. In addition to the Committee, the City's Corporation Counsel was aware of O'Reilly's employment with Realty Appraisal and determined that no conflict existed. DSOMF ¶ 118.[10] Before the Committee voted on the various proposals, it discussed the potential conflict of

---

[10] Although Plaintiff indicates that she disagrees, she provides no citation to disputed facts in the record and merely includes the conclusory assertion that "A conflict in fact existed." Thus, for the reasons explained in note 1, the Court considers this fact admitted.

interest and noted that Corporation Counsel had determined that there was not a conflict. *Id.* ¶ 119.[11]

Plaintiff was not comfortable awarding the contract to Realty Appraisal and raised the issue to Murphy, in the presence of Toloza and Hennessey, prior to the contract being awarded in February 2011. DSOMF ¶ 121. However, there is no genuine dispute of material fact that Murphy and Hennessey as Committee members were already aware of the possible conflict. Moreover, Plaintiff's opposition brief appears to concede this point, as she asserts that her "CEPA claims are admittedly stale and elementally insufficient respecting reporting requirement[.]" Plaintiff did not engage in a protected whistleblower act when she raised the potential conflict of interest issue to Murphy and, as a result, Plaintiff fails to satisfy the first required element for a CEPA claim, as to the conflict-of-interest issue, as a matter of law.

As for the remaining portion of Plaintiff's CEPA claims – concerning her report that Akil was using government employees to aid him with non-government work – there is no genuine dispute of material fact that Plaintiff suffered no adverse employment action. The only allegedly adverse employment action that appears connected to this portion of the CEPA claim is that Defendants initiated an investigation in May 2013 into Plaintiff's compliance with the New Jersey First Act. DSOMF ¶ 134; Compl. ¶ 26.

CEPA defines a retaliatory action as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." *Nardello v. Township of Vorhees*, 873 A.2d 577, 580 (N.J. Super. Ct.

---

[11] Plaintiff similarly purports to disagree with this statement but instead of citing to a disputed fact in the record, she states that "Some members of the committee found or noted there was no conflict. The plaintiff did not concur in that finding." The Court also considers this fact admitted.

App. Div. 2005) (quoting N.J. Stat. Ann. § 34:19-3).  New Jersey courts have explained that retaliatory action "speaks in terms of completed action" and that while "[d]ischarge, suspension or demotion are final acts, "'[r]etaliatory action' does not encompass action taken to effectuate the 'discharge, suspension or demotion,'" of an employee. *Hancock v. Borough of Oaklyn*, 790 A.2d 186, 193 (N.J. Super. Ct. App. Div. 2002) (quoting *Keelan v. Bell Comms. Research*, 674 A.3d 603, 607 (N.J. Super. Ct. App. Div. 1996)).  Therefore, "an investigation of an employee is not normally considered retaliation." *Beasley v. Passaic County*, 873 A.2d 673, 684-85 (N.J. Super. Ct. App. Div. 2005).  "An investigation, if conducted properly, should reveal whether the basis for the complaint is reasonable." *Id.* at 685 (internal quotation omitted).  Defendants' investigation of Plaintiff's possible failure to comply with the New Jersey First Act does not constitute a retaliatory act.  No adverse action was taken against Plaintiff as a result of the investigation.  Plaintiff points to no other evidence in the record to support an adverse employment action.  As a result, Plaintiff cannot establish this element of her CEPA claim as a matter of law.

The Court grants Defendants' motion for summary judgment on Counts One and Four and on Count One insofar as it asserts a CEPA claim.[12]

### B. NJLAD Claims

Count Two and a portion of Count One are brought under the NJLAD and are rooted in allegations of illegal discrimination and harassment and, possibly, a hostile work environment. The NJLAD, N.J. Stat. Ann. § 10:5-1 *et seq.*, prohibits discrimination based on race, color, and national origin, among other grounds. *Rios v. Meda Pharm., Inc.*, --- A.3d ---, 2021 WL 2639801, at *4 (N.J. 2021).  "[I]t is 'an unlawful employment practice' or 'unlawful discrimination' for an

---

[12] In light of the foregoing analysis, the Court does not reach Defendants' remaining arguments as to Plaintiff's CEPA claims.

employer 'to refuse to hire or employ,' 'to discharge or require to retire,' or 'to discriminate . . . in compensation or in terms, conditions or privileges of employment'" based on those grounds. *Id.* (quoting N.J. Stat. Ann. § 10:5-12(a)).

Plaintiff alleges that she was "forced by . . . defendants City of Jersey City, Eduardo Toloza and Robert Kakoleski . . . to be subordinate" to Christine Kakoleski and Michele Henessey, who are white women.  Compl. ¶ 13.  As a result of the unequal and unfair treatment she experienced, Plaintiff further alleges that her career and chances for job advancement have been damaged, she has experienced stress, and she has been discriminated against on the basis of her race, color, and national origin. *Id.* ¶ 14.  She continues that the City, Toloza, and Robert Kakoleski had a "policy and practice . . . of advancing the careers of white employees and managers and subordinating and even destroying the careers of black or African American, Puerto Rican and other racial minorities[.]" *Id.*  The Complaint specifically alleges the following ways in which she was treated differently from Henessey and Christine Kakoleski: Plaintiff was given more work, yet work of lesser variety and importance; she was not provided the same opportunities to obtain compensatory time in the aftermath of Hurricane Sandy; and she was not afforded reasonable accommodations to her work schedule. *Id.* ¶¶ 15-22.  Plaintiff additionally alleges that she was excluded from management and policy functions, not informed about meetings, and that Toloza "tried to make plaintiff seem to be an irresponsible person" through false statements and accusations. *Id.* ¶ 23. The Complaint indicates that Plaintiff reported the discriminatory conduct to the City of Jersey City Equal Employment Opportunity Office (EEO), however, the EEO was not "interested in fairly investigating and fairly evaluating plaintiff's claims of discrimination" and "also illegally discriminated, on the basis of race and ancestry[,] against plaintiff." *Id.* ¶ 24.

Defendants argue that Plaintiff's NJLAD claims fail as a matter of law. Mov. Br. at 20. Specifically, Defendants contend that Plaintiff was not subject to severe or pervasive conduct based on her protected status; she did not suffer an adverse employment action; that any allegations arising before September 13, 2011 are barred by the statute of limitation; and that, to the extent Plaintiff asserts an NJLAD retaliation claim, it is waived by the CEPA claim.

### 1. Hostile Work Environment

Based on the Complaint, it is not clear that Plaintiff raises a hostile work environment claim. However, Defendants' motion for summary judgment addresses such a claim. Mov. Br. at 25-30. Plaintiff's opposition brief includes a single reference to a hostile work environment, explaining that her "claims are premised upon illegal and unconstitutional violations of her employment rights, principal among them being her right to be free to from racial and ancestry discrimination and associated disparate treatment constituting a hostile work environment in her employment[.]" Opp. Br. at 2. Plaintiff does not otherwise refer to or analyze a hostile work environment claim. Insofar as Plaintiff seeks to assert a hostile work environment claim under the NJLAD, this Court grants Defendants' motion for summary judgment on that claim.

### 2. Racial Discrimination

To plead a *prima facie* NJLAD discrimination claim, a plaintiff must allege that she (1) is a member of a designated protected class; (2) was qualified for and performing the essential functions of the job; (3) suffered termination or adverse employment action; and (4) others not in the protected class did not suffer similar adverse employment decisions. *Victor v. State*, 4 A.3d 126, 141 (N.J. 2010). Defendants argue that Plaintiff suffered no adverse employment actions and, as a result, her claims fail as a matter of law. Mov. Br. at 30.

"Under the LAD, an 'adverse employment action' is one 'sufficiently severe or pervasive to have altered plaintiff's conditions of employment in an important and material manner.'" *Ivan v. County of Middlesex*, 595 F. Supp. 2d 425, 470 (D.N.J. 2009) (quoting *El-Sioufi v. St. Peter's Univ. Hosp.*, 887 A.2d 1170, 1188 (N.J. Super. Ct. App. Div. 2005)).  Plaintiff's submissions fail to indicate precisely the alleged adverse employment action.  Although she has argued that she suffered "substantial economic loss," Compl. ¶ 27, the Court is unable to identify any disputed material facts concerning an economic impact on Plaintiff, such as a salary reduction.[13]  Moreover, Plaintiff points to no facts in dispute  which demonstrate that Defendants' actions altered her conditions of employment in important and material ways.  There are no facts in the record from which a reasonable factfinder could conclude that Plaintiff suffered an adverse employment action.

As a result, the Court grants Defendants' motion for summary judgment on Count Two and on Count One insofar as it asserts an NJLAD claim.[14]

### C.  Section 1983 Claims

Count Three and a portion of Count One appear to be brought under 42 U.S.C. § 1983.  Presumably, like the NJLAD claims, Plaintiff's § 1983 claims are rooted in allegations of illegal discrimination and harassment.  Section 1983, in relevant part, provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the

---

[13] Plaintiff does allege that she was denied compensatory time.  Compl. ¶ 19.  Defendants cite to Toloza's deposition, which indicates that Plaintiff lived out of state at the time and, additionally, "Toloza could not offer any employees in his department such compensatory time without approval of the administration."  DSOMF ¶ 91.  Plaintiff notes that she "disputes" this fact and cites to Christine Kakoleski's testimony, which states that she was told she could receive compensatory time.  However, Plaintiff points to no facts which demonstrate that her Pennsylvania residency was not a bar to recovering compensatory time.

[14] In light of the foregoing analysis, the Court need not reach Defendants' arguments concerning the CEPA waiver and the statute of limitations.

> United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 does not provide substantive rights; rather, it provides a vehicle for vindicating violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To state a § 1983 claim, a plaintiff must demonstrate that "(1) a person deprived [her] of a federal right; and (2) the person who deprived [her] of that right acted under color of state or territorial law." *Burt v. CFG Health Sys*., No. 15-2279, 2015 WL 1646849, at *2 (D.N.J. Apr. 14, 2015).

Plaintiff fails to clearly indicate the relevant federal right or rights at issue. The Complaint merely states that "her indicated constitutional rights" were deprived, "which shocks the conscience and as such is a constitutional tort caused by a government entity under color of law which is within the scope of and remediable under 42 U.S.C. 1983 and other applicable federal and state law and statutes." Compl. ¶ 29. Defendants construe the Complaint to bring § 1983 claims seeking to vindicate rights under Title VII. Mov. Br. at 20, 30.[15] Plaintiff provides no argument or analysis to the contrary so the Court will similarly interpret Plaintiff's references to § 1983.

NJLAD and Title VII invoke the same analysis for discrimination claims. *E.g.*, *Wilson v. New Jersey*, No. 16-7915, 2019 WL 5485395, at *4 (D.N.J. Oct. 25, 2019); *Spence v. New Jersey*, No. 19-21490, 2021 WL 1345872, at *3 (D.N.J. Apr. 12, 2021). Thus, for the same reasons as expressed above for the NJLAD claims, the Court grants Defendants' motion for summary

---

[15] Defendants state in their brief that it is "not clear that a plaintiff may bring a hostile work environment claim under § 1983" within the Third Circuit. Mov. Br. at 25, n.2. However, the Circuit has determined "that § 1983 shares the same elements for discrimination purposes as a Title VII action. And a robust consensus of persuasive authority exists to clearly establish that creating a hostile work environment constitutes a § 1983 violation." *Starnes v. Butler Cty. Court of Common Pleas*, 971 F.3d 416, 428 (3d Cir. 2020) (internal citation omitted).

judgment on Plaintiff's § 1983 claims.  As a result, summary judgment is awarded in Defendants' favor on Count Three and on Count One insofar as it alleges § 1983 claims.

### D.  Contract Claims

Counts Six, Seven, and a portion of Count One allege breach of contract claims. Specifically, Plaintiff alleges that Defendants breached the employment contract between Plaintiff and the City and also breached the covenant of good faith and fair dealing. Compl. ¶¶ 42, 44. Defendants argue that Plaintiff's claims fail as a matter of law because (1) there is no evidence of an employment contract and (2) the claims are preempted by the NJLAD and CEPA claims.  Mov. Br. at 36-37.

Under New Jersey law, a Plaintiff must demonstrate the following to prevail on a breach of contract claim: (1) "that '[t]he parties entered into a contract containing certain terms';" (2) "that 'plaintiff[s] did what the contract required [them] to do';" (3) "that 'defendant[s] did not do what the contract required [them] to do[,]' defined as a 'breach of the contract';" and (4) "that 'defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s]." *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016) (alterations in original) (quoting *Model Jury Charge (Civil)*, § 4.10A "The Contract Claim—Generally" (May 1998)).

There is no evidence in the record from which a reasonable factfinder could conclude that a contract existed which governed the terms of Plaintiff's employment.  In fact, Plaintiff testified that she did not have an employment contract.  D.E. 172-4 at 31:6-17; PSOMF ¶ 44.  As a result, Plaintiff's breach of contract claims fail as a matter of law.  Relatedly, Plaintiff's breach of the covenant of good faith and fair dealing claims also fail because the existence of a contract is necessary to assert such a claim.  *Cumberland Farms, Inc. v. New Jersey Dep't of Env't Prot.*, 148

A.3d 767, 779 (N.J. Sup. Ct. App. Div. 2016).  Summary judgment is therefore awarded to Defendants on Counts Six, Seven, and on Count One insofar as it asserts contract claims.

### E.  New Jersey Civil Service Law Claims

Count Seven and a portion of Count One allege violations of New Jersey's civil service laws.  Defendants argue that these claims fail as a matter of law because New Jersey's civil service laws do not provide an independent cause of action and instead, provide a mechanism for administrative remedies.  Mov. Br. at 39-40.

The Complaint includes only barebones allegations that Defendants' conduct constituted a "general violation of the Civil Servi[ce] Laws of the State of New Jersey," Comp. ¶ 44, however Plaintiff fails to identify in the Complaint or in her opposition briefing precisely what laws were breached.  Defendants cite to *Ferraro v. City of Long Branch*, 714 A.2d 945, 954 (N.J. Super. Ct. App. Div. 1998), for the proposition that the breach of "New Jersey statutes and rules which protect civil servants and classified employees" does not "give rise to a suit for money damages as opposed to administrative relief."  Plaintiff's opposition brief fails to address this argument, explain the contours of the claim, or cite to any case law to the contrary.

While the Court does not disagree with Defendants' assertion, as a threshold matter, the legal basis or bases for Plaintiff's claim is entirely unclear.  Because the Court is unaware of any claim for "a general violation of the Civil Service Laws of the State of New Jersey," Defendants are entitled to summary judgment as a matter of law.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED**.

An appropriate Order accompanies this Opinion.

Dated:  August 4, 2021

_____
John Michael Vazquez, U.S.D.J.